81 N.J. Super. 161 (1963)
195 A.2d 200
LINCOLN FARM PRODUCTS CORP., A CORPORATION, PLAINTIFF-RESPONDENT,
v.
THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1963.
Decided November 18, 1963.
*162 Before Judges GAULKIN, LEWIS and LABRECQUE.
Mr. Vincent E. McGowan argued the cause for the defendant.
Mr. Marvin A. Sachs argued the cause for the plaintiff (Mr. Harold D. Feuerstein, attorney).
The opinion of the court was delivered by LABRECQUE, J.S.C. (temporarily assigned).
Defendant appeals from a judgment in favor of plaintiff entered by the trial court sitting without a jury.
Plaintiff had purchased 60,000 lbs. of tallow from the M.A. Delph Co., Indianapolis, Indiana, to be delivered to its plant in Newark, New Jersey. Such tallow or melted fat is used in the manufacturing of soap. The tallow was shipped from Massillon, Ohio, to Newark by Standard Provision Company, in a tank car owned by the Frey Company of Chicago and *163 furnished by the shipper. The car was loaded and sealed by Standard at its siding in Massillon. A bill of lading for the shipment was issued by the Pennsylvania Railroad Company for shipment over its line and that of the Central Railroad Company of New Jersey. The car remained sealed during transit. The bill of lading described the shipment as:

"TANK CAR INEDIBLE TALLOW APPROX. 60,000 lbs"
The bill of lading recited:
"Received * * * the property described below in apparent good order except as noted (contents and condition of contents of packages unknown) * * *"
The tank car consisted of a horizontal cylindrical steel tank having a dome at the top in which there was an opening through which the car could be loaded. There was an outlet at the bottom of the car which was provided with a valve controlled by a handle which could be reached only through the dome. Below the outlet valve was a short outlet pipe or chamber with a threaded end to which a hose could be attached to receive the contents of the car upon unloading. The outlet pipe was provided with a threaded screw cap. In the center of this, in turn, there was a small inspection plug.
At the trial, plaintiff's general manager, David E. Rothschild, testified that the customary way of loading tank cars with tallow was as follows: With the outlet valve in the closed position and the screw cap off, the tallow, which had been melted, was loaded into the car through the dome opening. The screw cap was left off the bottom of the outlet during the loading process to assure that the valve was operating properly, for if it was not, the tallow could be observed leaking through the outlet pipe. After the loading was completed, if there was no leakage through the valve, the cap was screwed on to the threaded end of the outlet pipe and both the dome and cap were sealed by the shipper. This testimony was received over the objection of defendant's counsel, who contended that first hand testimony was required as to the actual *164 method of loading employed by the shipper or its representative.
After loading, the tallow would again congeal into its solid state (similar to butter stored in the butter compartment of a refrigerator). This required a period of from two to two and one-half days during the wintertime. Upon arrival at destination, the tallow was melted with steam so that it could be drawn out through the outlet pipe at the bottom of the car.
Defendant delivered the car in question at plaintiff's siding on March 19, 1959. Two or three days later Franklin Thompson, an employee of plaintiff whose job it was to do the unloading, made an examination of the car. He testified that his inspection of the exterior revealed no evidence of damage or leakage. He found that the tallow in the car was solid. He also took off the inspection plug and looked up into the chamber of the outlet. This was about 18 inches high and he used a short length of pipe to see if there was any tallow there. He found that it was clear up to the valve disc. It was he who removed the seals from the dome and the bottom cap.
The car was actually unloaded about ten days after it was delivered to plaintiff. Preliminarily, it was necessary to connect a steam hose to the steam coils in the car in order to melt the tallow. After the heating began the witness looked into the dome opening but could not see the bottom of the car. By the second day the tallow was in liquid form. He testified that, preparatory to unloading it, he again removed the inspection plug and found that the outlet was clear with no evidence of leakage. He then unscrewed the cap, intending to hook up the discharge hose to the outlet pipe, but, before he could do so, the molten tallow began to run out. Attempts to close the valve failed to stem the flow and the cargo was discharged onto the ground. Later, upon entering into the interior of the car through the dome, it was found that the outlet valve was out of its seat and inoperable.
At the close of plaintiff's case, defendant moved to dismiss. Decision was reserved and the motion was renewed after defendant rested, in conjunction with a motion for judgment *165 in favor of defendant. Subsequently, the court denied both of defendant's motions and entered judgment in favor of plaintiff.
In his oral decision, the trial judge found, from the fact that no tallow was observed when the test plug was first removed after the car was delivered to plaintiff, that the valve had been properly seated when the car was loaded. He also found that the bill of lading was a clear bill, with no exceptions being noted. He concluded that the tank car and its contents were in good order when received by the initial carrier, that the defect in the valve which caused the loss of the cargo came about during shipment, and that defendant, as the delivering carrier, was liable for the damage which ensued.
Defendant urges that judgment should have been entered in its favor for the reason that (1) proof was lacking that the car and its contents were in good condition at the time of delivery to the initial carrier, and (2) the bill of lading did not constitute prima facie evidence that the car and its contents were in good condition at the time of such delivery.
From our examination of the evidence, we conclude that defendant's motion for judgment should have been granted.
A common carrier receiving property for transportation, as in the present case, is required to issue a bill of lading, and a delivering carrier is liable to the lawful holder thereof for any loss or damage in transit caused by it or by another common carrier to which the property may have been delivered or over whose line or lines such property may have passed. 49 U.S.C.A. § 20(11); New Jersey Bell Tel. Co. v. Pennsylvania-Reading Seashore Lines, 11 N.J. Super. 129 (Law Div. 1950). In order to recover against the delivering carrier, however, the burden is upon the plaintiff to show that (1) the goods in question were delivered to the initial carrier in good condition, and (2) the shipment arrived at destination in a damaged condition. Valco Manufacturing Co. v. C. Rickard & Sons, Inc., 22 N.J. Super. 578, 584 (App. Div. 1952). The law does not permit speculation or conjecture as to these elements, but requires that they be *166 established as a fundamental requisite. Ibid. See also Kaufherr & Co. v. Pennsylvania R. Co., 12 N.J. Misc. 542, 174 A. 27 (Sup. Ct. 1934); Gude v. Pennsylvania R. Co., 77 N.J.L. 391 (Sup. Ct. 1909); McMahon v. American Ry. Express Co., 6 N.J. Misc. 468, 141 A. 566 (Sup. Ct. 1928), affirmed per curiam 105 N.J.L. 494 (E. & A. 1929).
In the absence of direct evidence to establish that the outlet valve was functioning at the time of loading, the trial judge relied upon the testimony as to the customary method of unloading and the circumstance that no tallow had been found in the discharge outlet (between the outlet valve and the cap) when the car was delivered to the plaintiff. The assumption was that, if the valve had been open or leaking and the car had been loaded with the cap on, some of the leakage would have been trapped by the cap and would have been observable through the inspection plug. But this seems to us to ignore significant points. First, plaintiff's employee Thompson testified that after the tallow had melted he removed the test plug a second time and still found no evidence of leakage. He said he then replaced the test plug and unscrewed the screw cap, whereupon the tallow ran out. According to the theory of plaintiff's case, the removal of the test plug should have revealed that the outlet pipe was full of molten tallow which had flowed past the damaged valve. Plaintiff offers no explanation as to why Thompson saw no leakage when he opened the test plug. Some of the possible explanations would seem to be (1) he did not look, or (2) opening the test plug was not a reliable method of checking the condition of the valve, or (3) the valve did not begin to leak until after he had looked. Of course, there may be others.
The second point is that Rothschild also testified that defective valves had been discovered on other occasions, presumably not damaged through the fault of the carrier. He testified:
"* * * After the contents are melted the test plug should again be removed to find out if any material has seeped down through a *167 partially dislocated valve. After that, the hose is attached, the pump started up and lastly the valve opened.
Q. So that you remove the test plug on two separate occasions. You remove it first to see if there is any residue in the, what do you call it chamber? A. In the unloading coupling.
Q. In the unloading coupling? A. Coupling.
Q. And then again later after the material has been heated and liquefied, then you open it again? A. Right.
Q. And what happens if you find some residue of tallow in the unloading coupling? A. Then you replace the cap, try to seat the valve and continue the procedure. If you sit there you can remove it by a cup, which is a costly procedure, but we have had to do it in some cases." (Emphasis added)
It seems to us that the assumption made by the trial judge to support his decision also loses sight of the fact that the absence of tallow from the discharge outlet was equally consistent with the existence of a defect in the valve at the time of loading. For example, if by reason of the failure of the valve from any cause it had been necessary to load the car with the cap on, any tallow remaining in the outlet after the cargo had solidified could have been removed prior to the time the cap was sealed.
Again, assuming that the valve had been operating properly at the time of loading, there was no evidence adduced as to what transpired between the time the car was loaded and the time it was accepted by the initial carrier. The bill of lading was dated February 26, 1959, but the tallow had been ordered on February 19 and there was no testimony as to when the loading was completed, what the condition of the interior mechanism was after loading, when the car was sealed or what care the car received during the interim. There was no evidence to indicate that the valve control handle, which was located in the dome, had been protected against tampering between the time the car was loaded and the time the dome was sealed. The absence of tallow from the outlet at the time the car was delivered to the carrier did not negate the possibility of negligent handling of, or unauthorized meddling with, the valve handle during that period. It was thus equally consistent with lack of fault on the part of the carrier.
*168 In the absence of direct evidence, the plaintiff was required to establish not only the existence of such circumstances as would justify a possible responsibility on the part of the carriers for the defect, but the existence of such circumstances as would justify the inference that the loss was occasioned while the shipment was in the hands of the carriers and would exclude the idea that it was due to a cause with which they were unconnected. While proof to a certainty was not called for, the evidence was required to be of such quality as to justify an inference of probability as distinguished from mere possibility that the valve was in proper operating condition at the time of delivery to the initial carrier. Since the evidence in question was equally consistent with lack of fault, it was insufficient to withstand the defendant's motion. Callahan v. National Lead Co., 4 N.J. 150, 154-155 (1950).
We turn next to consideration of whether the bill of lading constituted evidence of the delivery of the car and its contents in good condition. The trial court referred, in its oral opinion, to Silver Lining v. Shein, 37 N.J. Super. 206 (App. Div. 1955), which held, citing Joseph Toker Co., Inc. v. Lehigh Valley R. Co., 12 N.J. 608, 612 (1953), that a bill of lading was "weighty and prima facie" evidence of delivery to the carrier in the quality and quantity described therein. We find neither case to be apposite. In Silver Lining v. Shein the shipment consisted of piece goods and the point in dispute was whether the goods were wet at the time they were picked up by the defendant motor carrier. There the condition of the goods was readily observable, and consequently the bill of lading was held to be evidential of the fact that, when they were picked up by the carrier, their condition was as described therein. In Toker, the dispute involved a discrepancy between the weight of a shipment of coal, as set forth in the bills of lading, and its delivered weight. In the instant case, the trial court was dealing with an entirely different situation. There was no defect in the quality or quantity of the tallow. The loss was occasioned by reason of a defect in the car itself.
*169 The bill of lading recited receipt of the tank car of tallow in "apparent good order except as noted (contents and condition of contents of packages unknown)." While an acknowledgment in a bill of lading that the goods have been received by the carrier in apparent good order is prima facie proof of their condition when the condition of the goods is apparent and observable, the rule is otherwise where the condition is concealed. Sprotte v. Delaware, L. & W.R. Co., 90 N.J.L. 720 (E. & A. 1917); Mears v. New York, N.H. & H.R. Co., 75 Conn. 171, 52 A. 610, 611, 56 L.R.A. 884 (Sup. Ct. Err. 1902); Shore v. New York, N.H. & H.R. Co., 99 Conn. 129, 121 A. 344 (Sup. Ct. Err. 1923); Ideal Plumbing & Heating Co. v. New York, N.H. & H.R. Co., 143 Conn. 640, 124 A.2d 908 (Sup. Ct. Err. 1956); Shepherd v. Naylor, 71 Mass. 591, 592 (Sup. Jud. Ct. 1856); Goldberg v. New York, N.H. & H.R. Co., 130 Me. 96, 153 A. 812 (Sup. Jud. Ct. 1931).
We see no reason to distinguish, on principle, between a box containing a piano which was furnished, loaded and securely closed by the shipper (as in Sprotte v. Delaware, L. & W.R. Co., supra) and a car which was furnished, loaded with tallow and securely sealed by the shipper, as in the instant case. Where, as here, the goods and the car are furnished by the shipper and are sealed, so that neither the car's interior nor its contents are observable, the issuance of a bill of lading does not establish prima facie proof that the car and its contents were in good order upon delivery to the issuing carrier.
When a fully loaded car of the type here indicated is delivered to a carrier, it is responsible only for such defects as may be discoverable by such visual inspection as it is able to make, and it is not responsible for imperfect packing or other carelessness on the part of the shipper. Blytheville Cotton Oil Co. v. Kurn, 155 F.2d 467 (6 Cir. 1946); Alabama & V. Ry. Co. v. American Cotton Oil Co., 249 F. 308 (5 Cir. 1918); Lever Bros. Co. v. Baltimore & O.R. Co., 164 F.2d 738, 739 (4 Cir. 1947). In the instant case there is no *170 proof that an inspection during transportation would have revealed the malfunctioning of the valve. Plaintiff's employee who inspected the car on arrival, found no exterior evidence of damage or leakage. Access to the valve during shipment was prevented by the congealed tallow which surrounded it and by the seals which had been affixed by the shipper.
For the foregoing reasons, the judgment of the Law Division is reversed and the case is remanded for a new trial, with costs to date in favor of the defendant regardless of the final outcome of the case.