113 N.J. Super. 19 (1971)
272 A.2d 549
NOPCO CHEMICAL COMPANY, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
BLAW-KNOX COMPANY, A CORPORATION OF NEW YORK, ET ALS., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1970.
Decided January 8, 1971.
*20 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. Albert E. Fershing argued the cause for appellant (Messrs. Shurkin, Hersh & Fershing, attorneys).
Mr. Augustus Nasmith argued the cause for respondent Blaw-Knox Company (Messrs. Carpenter, Bennett & Morrissey, attorneys).
Mr. John Methfessel argued the cause for respondent Central New York Freightways (Mr. Samuel A. Gennet, attorney).
*21 Mr. Neil Reiseman argued the cause for respondent Harrison Warehouse Corporation (Messrs. Schreiber and Lancaster, attorneys).
Mr. Richard M. Icklan argued the cause for respondent Belby Transfer Company (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
Mr. Marvin A. Sacks argued the cause for respondent John S. Geiger & Sons, Inc. (Messrs. Feuerstein, Sachs & Maitlin, attorneys).
PER CURIAM.
We are constrained to agree with the judgment of dismissal as to all defendants in this case, notwithstanding the probability that the damage to the equipment occurred while it was being loaded or unloaded by crane and cable by one or more of defendants, Blaw-Knox, Harrison Warehouse, Geiger or Belby.[1]
The only substantial proof as to how the damage occurred was that it was by steel cables rubbing against the equipment in the course of hoisting it without protective spreaders between the object and the cables. Cables were used by Blaw-Knox in loading onto Central Freightways' truck; by Harrison Warehouse in unloading from that truck and later in loading onto Belby's truck, and finally by Belby (which may have been aided by Geiger) in hoisting the object to the third floor of plaintiff's plant, and possibly in moving it into final position for use at that plant.
Taken as a whole, the proofs do not establish a basis for reasonably finding, as a matter of probability, that the *22 damage was caused by any particular one of the four handlers mentioned. It could have been by any.[2] See Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 141 (1951). Hannett, plaintiff's representative at the time of the occurrence (but not employed by it at the time of trial), testified he saw a smudge and a slight tear in the protective wrapping paper around the drums (the item damaged) while the equipment was at Harrison Warehouse. He complained to no one. Contradictorily, however, he said he saw no tear on the paper after delivery to plaintiff's premises by Belby. However, he did see cable marks on the trunnion (axle) portion of the drums, a portion not protectively wrapped, while the equipment was on Belby's truck before being lifted into the plant. But giving Hannett's testimony the most favorable reading from plaintiff's point of view, it would justify at most only an inference that either Blaw-Knox or Harrison Warehouse had done the damage, not that it was more probably one than the other.
There is no prima facie case against Central Freightways by virtue of its status as an interstate common carrier or by reason of its having given a "clear receipt" to Blaw-Knox. It is true that a common carrier is liable for any damage to goods while in its custody. But the rub here is absence of proof that the damage (abrasion of the drums by cable) occurred during the carrier's custody. Admittedly, Blaw-Knox put the equipment aboard the truck and Harrison Warehouse took it off, both firms using a crane and cable. The "clear receipt" given Blaw-Knox constitutes prima facie proof merely that there was no apparent damage to the goods when taken aboard by Central Freightways. Silver Lining, Inc. v. Shein, 37 N.J. Super. 206, 214 (App. Div. 1955); Lincoln Farm Products Corp. v. Central R.R. of N.J., 81 N.J. Super. 161, 168-169 (App. Div. 1963). It does not admit there was no concealed unobservable damage to the equipment. Even plaintiff's representatives, Hannett *23 and Batchelar, both of whom saw the equipment before it was unwrapped at terminus, saw no damage to the drums at that time. Thus the giving of the receipt by Central Freightways, in the light of all the other proof would not furnish a basis to permit a jury to conclude that the goods were in worse condition when the carrier delivered them than when they were delivered to it  a necessary prerequisite to liability. Silver Lining, Inc. v. Shein, supra, 37 N.J. Super. at 214.
Plaintiff's claim against Blaw-Knox for breach of warranty had to be dismissed because, on its own case, any defect in the article as manufactured was negatived by its own proofs that the defect was the result of abrasion by cable while in transit. Blaw-Knox could therefore be held, if at all, only for damaging the goods in placing them aboard the carrier at Buffalo  a thesis not established against it by plaintiff's proofs on the basis of probability as distinguished from mere speculative possibility. Hansen v. Eagle-Picher Lead Co., supra.
We are not insensitive to the plight of the unsuccessful plaintiff manifested by the dissenting opinion herein. However, it will be noted that discovery efforts by plaintiff were confined to interrogatories. No depositions were taken by it. Second, the mere denial of the motion to dismiss would not improve plaintiff's proof position if defendants rested without offering proofs  their undoubted right. Finally, the interests of justice are not served if, in the effort to make plaintiff whole, a jury is permitted at random to select any one out of three or four defendants for liability where the greater mathematical probability is that the negligence is that of another of them, if of any at all.
The commercial policy considerations advanced by the dissent might well call for a legislative solution through arbitrary placement of responsibility in a proof situation of this kind (compare the Carmack amendment, cited in the dissent). In the absence thereof, we see no justification for judicial remission here of the ordinary procedural principle *24 that a suitor must prove his case against a defendant by the preponderance of the probabilities.
Judgment affirmed; no costs.
CARTON, J.A.D. (dissenting).
The majority concede the probability that one or more of the defendants handling the dryer during the course of its journey from the manufactory to the purchaser's plant were responsible for its damaged condition. Yet they conclude that the law required the dismissal of the action at the end of plaintiff's case along with the dismissal of all cross-claims without imposing upon any defendant the obligation of coming forward with evidence as to what it did while the machine was in its possession and control.
The law does not compel such a "lame and impotent conclusion." Reason and ordinary common sence dictate that in such a commonplace, mercantile situation (involving as it does the handling and transportation by successive but unconnected carriers and other bailees for hire) existing procedures be adapted or a new remedy be devised which will cause those parties most likely to possess knowledge of the occurrence to come forward with the facts peculiarly within their possession. To me it seems indefensible that the court should stand idly by and lend itself to such an obvious thwarting of justice.
Such judicial reticence cannot be rationalized on any hypothesis that it is improbable any one defendant can be shown to be liable. This assumption discounts the possibility  and perhaps likelihood  that the defendants' proofs may well single out the one responsible from the group of those probably liable. Granting of judgment, at least at this juncture, is premature on any thesis.
The broader concept implicit in the majority's view that defendants have no responsibility to offer proof, and that the courts have no power to compel a full exposure of the facts, suggests a reverence to procedure which contravenes *25 the modern insistence that causes be determined on their merits.
There is no lack of feasible machinery to bring about a full disclosure of the facts and an ultimate determination on the merits in this case. A fuller review of the evidence than is related by the majority opinion will exemplify the inequity perpetrated simply because there exists no clear-cut precedent.
The dryer is a piece of machinery used to convert liquid chemicals into dry powders. It was purchased from defendant Blaw-Knox by plaintiff Nopco's purchase order dated November 23, 1964, specifically requiring that it meet a certain production capacity when installed and operated in accordance with drawings and instructions.
Blaw-Knox delivered it f.o.b. Buffalo to defendant Central New York Freightways, Inc. and loaded the machine onto Central's truck pursuant to a shipment contract. Central, an I.C.C. carrier, accepted the equipment on July 7, 1965 for shipment to Harrison Warehouse for Nopco as consignee. Upon acceptance of the equipment, Central issued a "clear receipt" to Blaw-Knox.
The next day Central transported the dryer on a flatbed truck to its Harrison destination as specified in the bill of lading. There defendant Harrison Warehouse Corporation's employees unloaded the dryer and placed it in the warehouse for storage. Harrison acknowledged that the dryer was received on July 8, 1965 for Nopco's account and that it was stored until on or about August 5 of that year.
On or about the latter date, Belby Transfer Company, under agreement with plaintiff, sent a truck-crane, which Belby had hired from defendant John S. Geiger & Sons, Inc., to Harrison Warehouse. The machine was loaded on Belby's truck by means of cables from an overhead crane operated by Harrison's employees. Belby delivered the dryer to plaintiff's plant. Either Belby's or Geiger's employees lifted the dryer to the third floor of the Nopco plant by means of a cable and crane operation. After the deposit of *26 the dryer in the proper location, Nopco's employees connected the steam piping and the electrical connections but did not move the dryer itself. Plaintiff's employees first discovered the damage which rendered the machine inoperable after its delivery to the Nopco plant when, in the presence of W.S. Woodhouse, Blaw-Knox's field engineer, the paper wrapping was removed from the drum.
There was credible evidence that the dryer was damaged in more than one area. The drum was damaged along the edge rendering the machine inoperable. This area had been covered by a heavy paper wrapping. Although that wrapping was smudged and scraped, the protective covering itself was not torn through. Damage to the trunnion or axle and flange was also present. This damage was visible at the time of the delivery to plaintiff. At that time Hannett, an engineer then employed by Nopco, determined that the markings on the trunnion would not interfere with the machine's operation, and that this damage was not caused by Belby. Thereupon, he issued a clear receipt to the Belby Transfer Company.
Further damage consisted of a series of small dents on the inside of the drum. However, it appears that this defect did not seriously affect the operation of the dryer.
Lastly, injury to the interior lining of the drum was caused by a revolving internal knife. This damage occurred after necessary repairs had been effected as to the previously listed defects.
Plaintiff offered no direct proof as to how the dryer was damaged. Nopco reasoned that since the machine was in a damaged and defective condition when it arrived at its plant, one or more of the defendants were responsible for the condition of the dryer. Plaintiff charged Blaw-Knox with negligence and with breach of contract and warranty as to fitness of the equipment for the use intended. Central New York Freightways, Inc. was included as a defendant on the basis of negligence and its absolute liability as an I.C.C. carrier. Plaintiff also charged John S. Geiger *27 & Sons with negligence, Harrison Warehouse with negligence based on breach of its duties as a warehouseman, and Belby for negligence as an intrastate carrier and bailee. No specific act of negligence was contended as against any defendant, nor did plaintiff offer to prove in whose hands the damage occurred.
In addition to the foregoing facts, plaintiff offered proof on the basis of interrogatories propounded to Blaw-Knox. It appears that Blaw-Knox's employees arranged with Central for delivery of the machine to the Harrison Warehouse as per Nopco's request; that Blaw-Knox used a crane and cable with wooden blocks between it and the drum when it loaded the machine onto Central's truck; that on or about September 15, 1965 its field engineer inspected the dryer at plaintiff's plant for the purpose of making a test operating run, and that as a result of that examination damage was discovered to the chrome plating on the drums. Visible cable marks were proximate to the damaged portions of the machine.
Central answered, in response to interrogatories, that Blaw-Knox loaded the machine onto the truck by crane; that the dryer was tied down on the truck by block chain and tarpaulin, and that on delivery to the warehouse the machine was unloaded by Harrison by use of a crane and cable.
Through similar interrogatories, Harrison stated that it took the dryer off the truck by means of an overhead crane; that Harrison received one crate, one skid, one motor and three boxes; that the "dryer was crated and skidded," and the "chrome plated roller assembled were within drier [sic] paper wrapped"; that the dryer was moved after being unloaded, and when reloaded onto Belby's truck was lifted by a cable and an overhead crane aided by slings placed under the skid and dryer; that Harrison's employees inspected the dryer on its arrival on July 8, and its departure on or about August 5, 1965, and that no damage was noted while the equipment was in Harrison's possession.
Belby, in answer to interrogatories, stated that when the dryer was being picked up inside the warehouse it was loaded *28 by means of an overhead crane operated by Harrison's employees using rope cables  cable slings passed under the crated and skidded dryer and hooked to the crane's lifting cable; that upon delivery to Nopco the dryer was hoisted to the third floor of plaintiff's building by means of the truck crane in an operation in which "cables from truck crane were fastened to slings under skid and drier [sic] * * * [and was] placed in from bed of truck into third floor opening of Nopco building."
Plaintiff also offered the testimony of its plant engineer, Dennis Batchelar. He, along with Hannett, viewed the machine at the Harrison Warehouse several weeks after its arrival at the warehouse. At that time the machine was skidded, the drums were wrapped in paper and the remaining parts, the crates, hood and motor, were stationed beside them. He did not remove or look under the paper or see the drums themselves.
Batchelar procured the Belby Transfer Company to transport the machinery from the warehouse to the Nopco plant. Upon delivery to the plant, the dryer was lifted by crane to the third floor. He averred that Nopco did no lifting or hoisting of the machine and that no work was done by Nopco's employees on the dryer other than steam fitting and electrical connecting work. He testified that Woodhouse, Blaw-Knox's field engineer, showed him the damage after the dryer was delivered to the Nopco plant. Woodhouse found that "damage occurred on the edge of the drums where the cylindrical surface meets the flat end of the drums right on the corner" and in "several places where the chrome surface was broken."
Batchelar stated that there were cable marks on the trunnions, which are the "axles of the drums that fit in the end frames." The engineer expressed the opinion that a cable had been applied to the trunnions, attached to a crane or hook and drawn up. As it was being lifted, the cable pinched in against the flange and edge of the drum causing abrasion and damage. Batchelar was also shown photographs of the *29 dryer which he testified reflected the damage to the drums as well as the attempted repairs made by the Mirror Plating Company at the Nopco plant.
Batchelar added that Woodhouse, after inspecting repairs made by Mirror Plating at Nopco's premises, indicated that the machine was still not operable. After some discussion with Blaw-Knox's representatives, it was decided that rather than send the machine to the plating company directly, it should be sent to Blaw-Knox who would in turn send it to the plating people. Upon the return of the drums from Buffalo to Nopco, an operating test was conducted. At this time additional damage (having no connection with the original defect) was caused by the internal knives of the dryer. As a result of further discussions with Woodhouse, it was concluded that the drums had to be "stoned" to correct the damage. This stoning took place at the Nopco plant. On March 1, 1966 the machine performed satisfactorily for the first time.
Hannett testified that he was present at Nopco when the paper wrapping was removed. The damage to the dryer was first discovered in Woodhouse's presence. Hannett stated that he had visited Harrison Warehouse for the purpose of verifying that all the parts had arrived. Although he did not inspect the equipment, he did notice smudge marks on and slight tears in the paper covering the drums. He corroborated Batchelar's testimony as to the attempted field repair by Mirror, the negotiations with Blaw-Knox, and the subsequent knife damage. He expressed the opinion, as an engineer, that the damage to the drum was caused by the impression left by a steel cable attached on the trunnion end.
The trial court, in dismissing the action against all defendants, ruled that plaintiff had failed to sustain the burden of proof that any particular defendant was responsible for the damage. Over plaintiff's objection, the court also granted defendants' applications to withdraw their various cross-claims for contribution on the theory that since plaintiff *30 could show no right of recovery against any one of them, it was not entitled to insist they proceed to adduce evidence on the issues thus raised.
In large degree, plaintiff's dilemma arose because the equipment had to be shipped and handled by various unconnected concerns en route to its plant. This circumstance would render it unlikely that plaintiff, any more than any other purchaser of merchandise shipped by carrier and stored by warehousemen, would have acquired or could have readily obtained information as to when the alleged damage occurred or as to what or who caused it. Discovery procedures, of course, are available, but have practical limitations peculiar to the transportation sector of the commercial world. Moreover, elaborate and expensive discovery methods should not be a prerequisite to a cause of action in all situations. Would not almost the precise situation which confronted the trial court be presented if the item damaged in transit were a household refrigerator, a television, or even a radio? Could it reasonably be argued that in order for the purchaser to recover he ought to be required to take the depositions of all of the persons who successively handled the product?
The Uniform Commercial Code, "Sales," represents a recognition of an allocation of responsibilities between parties to commercial transactions generally in such a way that modern enterprise can be maintained in a practical and inexpensive manner. See, generally, N.J.S.A. 12A:2-201 et seq. So too, the responsibilities of those involved in transportation and warehousing commerce have been modernized by the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.) and Uniform Commercial Code, "Documents of Title" (N.J.S.A. 12A:7-101 et seq.). These codifications embody, in large measure, judicially pronounced developments in the law merchant. These modernizations of commercial law include many situations which require the defendant in a commercial transaction such as that here involved to come forward with information peculiarly available to him.
*31 Plaintiff, of course, could have initially started a separate action against a single defendant. By doing so, the rights and duties existing between Nopco and the particular defendant would be placed in sharper focus. But such a course of action would also have jeopardized Nopco's right of probable recovery by facilitating the defense of the party initially sued that others rather than it were chargeable for the damage. And, if plaintiff failed in its first effort to fix responsibility, it would have no alternative except to proceed against each succeeding or preceding defendant and go through the same process. The public interest in avoiding circuity of action and in maintaining a rational relation between the cost of achieving justice and the value of the subject matter of the litigation allied with plaintiff's self-interest dictated the bringing of a single action.
Certain presumptions established for the protection of a receiver of property in interstate and intrastate commerce, including those where connecting carriers are involved and those concerning common carriers on through shipments, are not available to plaintiff in this case. See Herman v. Railway Express Agency, Inc., 17 N.J. Super. 10 (App. Div. 1951) (recognizing the presumption that injury resulted from negligence of last of line of connecting carriers); New Jersey Bell Tel. Co. v. Penna.-Reading S.S. Lines, 11 N.J. Super. 129 (Law Div. 1950) (establishing liability of delivering carrier under interstate through bill of lading for loss or damage in transit by any of connecting carriers). Compare Dantes v. McGann, 98 N.J.L. 55 (Sup. Ct. 1922), to the situation in this case. See also Prosser on Torts (3d ed. 1964), § 39; 2 Harper and James, The Law of Torts, § 19.7 at 1085, 1089 (1956).
Only one of the parties, Central New York Freightways, is a carrier subject to the jurisdiction of the Interstate Commerce Commission. Belby is the only other carrier. Furthermore, the goods were not shipped on a through bill of lading to plaintiff's plant, but were delivered to Blaw-Knox f.o.b. Buffalo for transportation only to Harrison Warehouse. However, this staggered delivery process should not derogate *32 from the fact that the procedures used were essentially one continuous transaction. The underlying considerations which prompted the common law to shift the burden of producing evidence to the party having peculiar knowledge of the occurrence is equally appropriate in this mercantile transportation transaction.
Here, Nopco was the purchaser of a piece of newly-manufactured machinery. If plaintiff's proofs that its employees merely made the connections and did not work on the dryer itself were given credence, defendants Blaw-Knox, Central New York Freightways, Harrison Warehouse, Belby, and Geiger were the only parties who had anything to do with the manufacture and delivery of this equipment prior to the discovery of the damaged condition. On the basis of such proof, the original damage to the drums and the trunnions had to be attributed to one or more of these defendants. No one contended that the damage was the result of an act of God for which plaintiff could have no recourse.
Whether the burden of coming forward should begin with the bailee last to be in control (see Julius Klugman's Sons v. Oceanic Steam Nav. Co., 42 F.2d 461 (S.D.N.Y. 1930)), or whether a procedure similar to that mandated by the Carmack amendment should be adopted, (49 U.S.C.A. § 20, par. (11)), plaintiff should have the benefit of such evidence.
As each bailee introduces evidence as to its part in the transaction, plaintiff would be entitled to the benefits of that evidence as against the succeeding or preceding bailee.
There is some indication that some, if not all, defendants were issued clear receipts upon their delivering the dryer to the successive party. Although such a receipt may be prima facie evidence of delivery visably in good order, the clear receipt does not have a like effect with respect to any concealed damage, nor does it relieve the respective party of the duty of coming forward with evidence on this score. Cf. Lincoln Farm Products Corp. v. Central R.R. of N.J., 81 N.J. *33 Super. 161 (App. Div. 1963); Silver Lining Inc. v. Shein, 37 N.J. Super. 206 (App. Div. 1955).
Since the record is not entirely clear as to whether Geiger & Sons supplied the truck-crane for use by Belby, or whether its men also participated in rigging the apparatus or in the unloading operation, disposition of the motion to dismiss as to this defendant should also be held in abeyance until the conclusion of the evidence. The record indicates that an indemnification agreement exists protecting Geiger. However, Belby's liability to Geiger under the agreement must await disposition as a cross-claim unless liability thereunder is previously stipulated.
If the successive bailees absolve themselves from liability, that evidence would then be available as against Blaw-Knox in plaintiff's action for breach of contract and implied warranty. N.J.S.A. 12A:2-314 and 315. That Nopco did not follow the method of recovery authorized by the express warranty may not foreclose its right of recovery against Blaw-Knox if that manufacturer did not validly disclaim its implied warranties. N.J.S.A. 12A:2-316. Moreover, since Blaw-Knox through its representatives, negotiated with Nopco to effectuate repairs through a particular means, the efficacy of the sole remedy authorized by the express warranty may have been waived. N.J.S.A. 12A:2-316.
Moreover, the secondary damage to the drum lining caused by the revolving knives occurred at plaintiff's plant after the other damage was already corrected. It appears that this malfunction was unrelated to the original damage. Blaw-Knox may be independently liable under its implied warranties for this apparent defect. See N.J.S.A. 12A:2-314, 315 and 316.
Plaintiff's evidence, together with all legitimate inferences therefrom, presented at least a sufficient basis for requiring that each of those defendants in whose custody and control the damage might have occurred to come forward with evidence as to their respective part in the transaction. Cf. Gould v. Winokur, 104 N.J. Super. 329, 332 (App. Div.), certif. *34 den. 53 N.J. 582 (1969). The decision on the motions for dismissal and on the defendants' various cross-claims should have been held in abeyance until the close of all the evidence. See R. 4:37-2(b) and (c) and 37-3.
Such action by the court represents no radical departure from existing procedures and imposes no onerous or unreasonable burden on any defendant already a party to the litigation. Most important, it permits an adjudication on the merits, the ultimate goal of every judicial proceeding.
I would reverse and remand for a new trial.
NOTES
[1] The nature of the damage strongly suggests it was done by only one of defendants Blaw-Knox, Harrison Warehouse, or Geiger and Belby (who worked together) However, there is also a slight possibility from the evidence that the damage was done by the steam-fitters, electricians or other workers who connected up the equipment for plaintiff after it was delivered and before the damage was discovered. Discovery of the damage, under the varying proofs, could have been three days or three weeks after delivery of the equipment.
[2] See footnote 1, above.