151 N.J. Super. 151 (1977)
376 A.2d 603
W.J. CASEY TRUCKING & RIGGING CO., INC. A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
GENERAL ELECTRIC COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 21, 1977.
*153 Mr. Samuel A. Gennet for plaintiff (Mr. Stanley W. Kallman on the brief).
Mr. Joseph E. Irenas for defendant (Messrs. McCarter & English, attorneys; Mr. Michael C. Barr on the brief),
DREIER, J.C.C., temporarily assigned.
This motion for partial summary judgment addresses the narrow issue of "patency" in the context of a common carrier's liability for damage to goods negligently loaded by the shipper.
Plaintiff, a common carrier engaged in the business of rigging, hauling and trucking, initiated this lawsuit to recover on its contract with General Electric (G.E.), for the unloading, repacking and reloading of certain equipment on September 10, 1975. The transaction underlying G.E.'s counterclaim is an earlier contract of carriage of January 10, 1975, during which it is alleged that plaintiff was negligent in transporting a G.E. rotor from defendant's service shop in North Bergen to the Public Service Electric & Gas Company generating station in Burlington. G.E. moved here for partial summary judgment on its counterclaim for damages sustained to the rotor.
Depositions of plaintiff's driver, Anthony Hines, form the factual basis of the motion. A driver of 16 years' experience, Hines was accustomed to handling and hauling large equipment. Upon being dispatched to pick up and deliver the rotor, Hines arrived at defendant's shipping office at about 3 P.M. The loading of the rotor began at about six or seven o'clock *154 that evening, G.E. personnel assuming direct responsibility for loading the rotor onto the truck. An overhead crane was used to lower the rotor onto blocking that was supplied by and positioned on the bed of the trailer by G.E. personnel. After the rotor was loaded onto the blocks, "chocks" were then nailed to the front of the blocking to prevent sliding. A tarpaulin was then placed over the equipment by Hines and nailed down to the floor of the trailer to protect the equipment from external moisture. Hines then, pursuant to instructions from G.E. personnel, wrapped the chains directly over the top of the piece and placed 2" x 4" blocks under it so that the chain would not touch the piece itself. G.E. personnel expressed concern over the retaining ring on the rotor, and Hines was told that the ring was not to touch anything and that there was to be no weight put on it. In directing the chaining of the rotor, Hines again was told not to put a chain on the retaining ring. This chaining process was summarized by Hines as follows:
A. They told me where to put the chains. They did tell me where to put the chains and they told me how to put the chains on. I made a suggestion as to how to chain it and they rejected it. I put the chains over the piece. They helped me to put the blocks under the chains and then one man helped me to tighten the chains down, too.
Hines left the G.E. facility at about 8 P.M. After proceeding south on Tonnelle Avenue, approximately one-half mile from the G.E. facility, Hines was cut off by a car that swerved in front of him. He came to an abrupt halt and heard a loud thump. He got out of his truck to check the load, but could not see any damage because the tarpaulin covering the piece had been nailed to the floor. He observed that the chains around the equipment were intact and proceeded to his destination.
When he arrived at the facility in Burlington it was discovered that the machine had shifted. The delivery was rejected and the load was returned to G.E. Further examination *155 revealed that the rotor had evidently slid forward and the retaining ring came to rest on the trailer, causing the damage complained of.
The applicable law is not seriously disputed. At common law, a common carrier was the virtual insurer of all goods coming into his charge. As the case law developed, however, certain exceptions to liability evolved. As stated in Jos. Toker Co., Inc. v. Lehigh Valley R.R. Co., 12 N.J. 608 (1953);
The original exceptions were confined to losses resulting from acts of God or the public enemy but they have now been expanded to certain other losses including those resulting from the inherent nature of the property or the default of the shipper. [at 611; citations omitted]
Cf. Kassel Poultry Co. v. Penna. R.R. Co., 7 N.J. Misc. 301, 304, 145 A. 316 (Sup. Ct. 1929); 13 C.J.S., Carriers, § 71 et seq.
Thus we see that the harshness of the common law rule is mitigated by a showing that the goods were negligently loaded by the shipper and that such defective loading was the proximate cause of the damage. However, once the shipper satisfies its threshold obligation of showing pick-up by the carrier of goods in a better condition than when delivered, the burden of establishing strictly that the damage resulted from one of the exceptions to absolute liability rests firmly upon the carrier. Silver Lining, Inc. v. Shein, 37 N.J. Super. 206, 212-215 (App. Div. 1955); Jos. Toker Co., supra, 12 N.J. at 611.
G.E., notwithstanding its own conceded negligence in the loading of the rotor, argues that the carrier may not avail itself of the defense of improper loading since the defective loading was patent and readily observable by the carrier.[1] *156 The rule urged by defendant may be broadly outlined as follows:
While some decisions (a minority) hold, or at least declare broadly that a carrier is not to be held responsible for loss occasioned by imperfect loading by, or other carelessness on the part of, the shipper, the general rule is that when the shipper assumes the responsibility of loading, the carrier is not liable where the defects in loading are latent or concealed so that they cannot be discovered by ordinary inspection and observation, but if the improper loading is apparent, that is, if it is a fact which addresses itself to the ordinary observation of the carrier or its servants, the carrier will be held liable notwithstanding the negligence of the shipper or his agents. Annotation: "Liability of Carrier by Land or Air for Damage to Goods shipped Resulting from Improper Loading", 44 A.L.R.2d 993, 1000 (1955).
See also, U.S. v. Savage Truck Line, Inc., 209 F.2d 442 (4 Cir.1953); Blytheville Cotton Oil Co. v. Kurn, 155 F.2d *157 467 (6 Cir.1946); Alabama & V. Ry. Co. v. American Cotton Oil Co., 249 F. 308 (5 Cir.1918); 13 C.J.S., Carriers, § 67.
This court has found no New Jersey case that deals directly with this exception, but the case of Lincoln Farm Products Corp. v. Central R.R. of N.J., 81 N.J. Super. 161 (App. Div. 1963), touches upon the issue. In that case the buyer of the goods brought a claim against the carrier for tallow lost during unloading due to a latent defect in the tank car valve. The tank car, furnished to defendant by the shipper, was loaded by it and sealed at its private siding. In reversing a judgment for plaintiff at the trial level, the Court stated the principle in this way:
When a fully loaded car of the type here indicated is delivered to a carrier, it is responsible only for such defects as may be discoverable by such visual inspection as it is able to make, and it is not responsible for imperfect packing or other carelessness on the part of the shipper. * * * In the instant case there is no proof that an inspection during transportation would have revealed the malfunctioning of the valve. [at 170]
While the Lincoln Farm case does not so specifically state, it is apparent that New Jersey also accepts as the rule the converse of the above-quoted statement, namely that the carrier is liable after having accepted the goods, if the defect in loading or packing is "patent."
With regard to the issue of what is "patent," the federal courts have noted: "As to defects not perfectly apparent, the test is one of `ordinary observation.'" Modern Tool Corp., v. Pennsylvania R.R. Co., 100 F. Supp. 595, 598 (D.C.N.J. 1951).
We come now to a consideration of the merits of the application of the rule to the case at bar, and in particular, the advisability of making such a finding on a motion for summary judgment. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954); Jackson v. Muhlenberg Hospital, 53 N.J. 138, 142 (1969); R. 4:46. Although *158 the question addressed to the court is a factual one, on the surface it would appear that the fact of Hines' observation of defective loading is established conclusively by his deposition testimony. However, in this court's opinion, G.E. misconceives the meaning of "observable defects rule" and the reasons for its existence.
There is no question here but that Hines' testimony establishes his disagreement with the manner in which the rotor was loaded by G.E. This, however, begs the more relevant question of whether it was apparent that the goods, loaded as they were, could not safely be carried to their destination. As stated in C.J.S., Carriers at 150-151, § 78, and quoted by the court in Modern Tool Corp., supra:
It cannot be said, however, under this rule that the carrier must, at his peril, know that the goods are not in fact safely packed. The shipper usually knows better than the carrier the manner in which the goods have been packed and the manner in which they could be packed, and even though the carrier may have knowledge of some defect in the packing, still if it is not apparent to the ordinary observation of the carrier or his servants that the goods cannot be safely carried in the condition in which they are presented, the carrier should not be held to take the chances of injury from improper packing.
The case of Alabama & V. Ry. Co. v. American Cotton, supra, involved an action by the buyer of cottonseed oil which was loaded into plaintiff's tank car by the seller. The inner valve of the car was not closed. The outer valve, or discharge pipe beneath the car, was closed by an outer cap, but the cap fell off during transit due to its defective condition. Although the outer cap was not designed to hold the contents of the car intact, it would have had that effect had it not been defective. The court there found that although an inspection would have disclosed a readily observable defect in the outer cap, it would not have suggested the necessity of making any change in the car since there was testimony that outer caps became unscrewed in transit "not infrequently" with no resultant damage.
*159 In the instant case Hines indicated that although he had handled many large objects, he had never handled an object of this type. He had never had a load like the one in issue shift on him during transit. Upon volunteering his own views relating to chaining and blocking of the rotor he was told "not to worry about it" and that G.E. people had loaded pieces like that before and "that's all they were going to do with it." He also indicated that among the G.E. personnel loading that day was a supervisor, presumably employed by G.E. to oversee the operation. Upon this record, this court is not prepared to find anything more than that the carrier and the shipper did not agree on the best way for the rotor to be secured on the trailer. No facts have been adduced at this point indicating that the manner in which the rotor was loaded did not conform to filed tariff or freight classifications prescribing proper loading procedure. And, although a carrier is free to reject a shipment which is not properly loaded, a jury could determine that the rotor was properly loaded and that the damage was caused by an eventuality for which the carrier would be held liable anyway.
Similarly, a jury could determine that although Hines initially disagreed with G.E.'s loading procedure, he was lulled into a false sense of security by the statements of G.E. personnel. If this is the case, common sense dictates that this court should not construe the rule to encourage the negligence of shippers and thus discourage any helpful suggestions by a carrier.
The court need not engage in such speculation. The question of "patency," viz., whether the manner of loading of the rotor in the instance was such that by ordinary observation it was apparent to the carrier that the rotor could not be safely carried, is one for the jury. The motion for partial summary judgment is denied.
NOTES
[1] The argument necessitates a review of the testimony taken at depositions. Reliance is placed upon the following excerpts from Hines' deposition:

Q. Did you call to the attention of the G.E. people that it was your view that the rotor would have been more secure had you chained it in the way you had indicated here today * * *?
A. Yes, I did.
Q. * * * did you indicate to them any question in your mind as to the security with which they were blocking the unit?
A. Yes, I did. I told them it was not adequate.
Q. And what did they say when you told them it was not adequate?
A. They said, not to worry about it, that they have loaded pieces like that before and that's all they were going to do with it.
* * * * * * * *
Q. And why do you think it was not adequate?
A. Because there was not enough contact between the blocking and the piece to compensate for the weight.
Q. Could you explain that?
A. * * * there was only twelve inches of contact * * * between the rotor and the blocking.
Q. And what do you think should have been done?
A. Well, personally, from my experience hauling other pieces of similar weight and size, there should have been at least forty eight inches.
* * * * * * * *
Q. You are saying the blocks should have been bigger, is that it?
A. There should have been more of them. What they put on that trailer was not enough to hold that piece steady.